UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HENRI MAALOUF,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:16-cv-280 (JDB) |
| ) | |
| **THE ISLAMIC REPUBLIC OF IRAN** ) | |
| and ) | |
| **THE IRANIAN MINISTRY OF INFORMATION** ) | |
| **AND SECURITY**, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S MEMORANDUM IN RESPONSE
TO THE COURT'S ORDER TO SHOW CAUSE**

Plaintiff Henri Maalouf brings this action claiming damages from Defendants The Islamic Republic of Iran and the Iranian Ministry of Information and Security (collectively, "Iran"), deriving from the terrorist bombing of the United States Embassy in Beirut, Lebanon, on September 20, 1984. Plaintiff's brother Edward, a security guard at the Embassy, was killed in the attack. Plaintiff alleges, and this Court has repeatedly held,[1] that Iran was responsible for financing and planning the incident, and therefore that an award of compensatory and punitive damages against Iran is appropriate. The Court now asks whether the action should be dismissed as untimely.

What is at issue here is not only a narrow question concerning the interpretation of statutory language. This case also raises a far broader and more important question, about whether and under what circumstances a state sponsor of terrorism is entitled to immunity – that is, to impunity – for

---

[1] *See*, for example, *Doe v. Islamic Republic of Iran*, 808 F. Supp.2d, 1, 8-9, 16 (D.D.C. 2011); *Dammarell v. Islamic Republic of Iran*, 281 F. Supp.2d 105 (D.D.C. 2006); 404 F. Supp. 2d, 261 274-5 (D.D.C. 2005); *Welch v. Islamic Republic of Iran*, Civ. A. No. 01-863, 2007 U.S. Dist. LEXIS 99191 (D.D.C. September 20, 2007). In one of these cases, *Doe v. Islamic Republic of Iran*, several of Plaintiff's family members were awarded damages for Edward's death

1

the consequences of murderous attacks that result in the deaths of American diplomatic personnel and their support staffs. Plaintiff Maalouf respectfully argues that the Court is not mandated by law or policy to dismiss, and that it should not exercise its discretion to extend considerations or comity to the rogue regime that killed his brother.

The outcome that Plaintiff urges is precisely what the Supreme Court endorsed in its decision in *Bank Markazi v. Peterson*, 578 U.S. ___ (April 20, 2016), upholding a Congressional direction to make certain blocked Iranian funds available for execution by judgment creditors including victims, and survivors of victims, of Iranian-sponsored terrorism.

This case was filed in this Court on February 27, 2016, alleging that Iran is not entitled to immunity from suit by virtue of the so-called "terrorism exception to the jurisdictional immunity of a foreign state," 28 U.S.C. § 1605A. That section of the Foreign Sovereign Immunities Act ("FSIA") provides, *inter alia*, for the following limitations period:

> (b) Limitations. An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208) not later than the latter of –
>
> (1) 10 years after April 24, 1996; or
>
> (2) 10 years after the date on which the cause of action arose.

There is no question but that this suit was not initiated within ten years of April 24, 1996. But regardless of whether the cause of action arose at the time of the bombing or when the legislation was changed to permit suits against state sponsors of terrorism, this case would still be outside the 10-year window. And even if it were treated as a "related action" to *Doe*, 808 F.Supp.2d 1, under § 1083(c)(3) of the National Defense Authorization Act of 2008, the case would be barred for having been filed more than 60 days after the entry of judgment in that matter.

However, there is also no question that Iran has not appeared in this action, and has not submitted a response or a motion suggesting that it intends to rely on the limitations provisions of the FSIA as the grounds for a request that the Court dismiss the case. Nor, as a practical matter, is there any likelihood that Defendants will do so in the future. Limitations is an affirmative defense under the Federal Rules of Civil Procedure, Rule 8(c)(1), which must be raised by a defendant or it is waived.

On March 24, 2016, this Court entered a Memorandum Opinion in the case of *Sheikh v. Republic of the Sudan*, Civil Action No. 1: 14-cv-2090 (JDB)[2]. On the same day, it filed an Order to Show Cause, directing Plaintiff Maalouf in the instant case to "file by not later than April 25, 2016, a memorandum explaining why this action should not be dismissed as untimely." This Memorandum is Plaintiff's response to that Order.

## I.   Introduction.

This Court is well familiar with the facts and circumstances of the terrorist attacks on United States diplomatic premises in Beirut in 1983 and 1984. The conclusion that Iran bore legal responsibility for the atrocities has been firmly and conclusively stated by this Court on numerous occasions:

> The record … is clear: MOIS played an intimate and significant role in sponsoring terrorist activities directed at Americans in Lebanon from 1979 forward, including the bombing of the U.S. Embassy in September, 1984. Now more than ever, this Court believes that the acts of terrorists and their sponsors must be punished to the full extent to which civil damage awards might operate to suppress such activities in the future. Indeed, [an expert witness] opined that since the terrorist attacks of September 11, 2001, Iran has become increasingly aware of the pending FSIA lawsuits against it here in the United States, and a failure to impose a substantial punitive award against MOIS might be misinterpreted as an inclination on the part of the courts of the United States to be more tolerant of Iranian-

---

[2] This decision has not yet been reported, even by Westlaw, so references below are to the slip opinion (Document 8-1) attached to the Order to Show Cause. The *Sheikh* case actually consolidated two similar complaints: *Sheikh v. Sudan*, No. 14-2090, and *Kinyua v. Sudan*, No. 14-2118.

3

> sponsored terrorism of a somewhat distant past. That may be a policy option of diplomacy, but not of the law. Terrorism, past and future, is the implacable enemy of all civilization under law. Therefore, consistent with past awards of three times the amount of MOIS's estimated annual budget for terrorist activities, this Court awards plaintiffs $300 million in punitive damages against the MOIS.

*Wagner v. Islamic Republic of Iran*, 172 F. Supp.2d 128, 138 (D.D.C. 2001).

Some survivors of Edward Maalouf, a guard at the Embassy in 1984, were parties plaintiff in the *Doe* class action. In those proceedings, this Court referred to Magistrate Judge Facciola the determination of whether individual plaintiffs' claims were compensable, and if so in what amount. The Magistrate Judge recommended, and this Court granted, compensatory damages awards[3] of $3,665,060 for Edward's estate, $57,378,627 for his widow, $35,861,648 for his son, and $17,930,824 for each of his three sisters.[4]

But Plaintiff Henry Maalouf did not participate in the *Doe* litigation, because he did not know about it. See Declaration of Henri Laamlouf, attached. He was living outside Lebanon, and was not in regular touch with the surviving members of his family. He had no idea that there could be a lawsuit to recover compensation from anyone for the pain and suffering he underwent as a result of his brother's horrific death, or that any court would have the power to award damages against the sponsors and paymasters of the attack in Tehran.

Once he heard that there was the possibility of recovering some measure of recompense for his loss, Plaintiff sought counsel in the United States, ultimately engaging the undersigned. Suit was promptly filed. Service was effected through the procedures outlined in 28 U.S.C. § 1608(a)(4) (*i.e.*, through diplomatic channels): a cumbersome, time-consuming, and expensive process exacerbated

---

[3] Each plaintiff in *Doe* was also awarded a portion of a per-victim punitive damages award of $300 million, of which the share attributable to Edward's killing was $11,111,111.
[4] Edward Maalouf was assigned the pseudonym "John GG Doe" in the *Doe* proceedings. It seems clear that, had current Plaintiff Henri Maalouf been a party to the earlier case, as a surviving sibling he too would have been awarded $17,930,824 in compensatory damages.

by the lack of diplomatic relations between the United States and Iran.[5]  But given its past performance in similar cases, it is virtually certain that Iran will neither appear nor defend in this case as it moves forward.

## II.   *Sheikh* Does Not Require that This Case Be Dismissed.

A. In *Sheikh*, the claims against Iran were not dismissed.

The *Sheikh* case concerned two other terrorist attacks against American diplomatic locations, those being the 1998 truck bombings of the Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. In litigation initiated in 2001, *Owens v. Republic of Sudan*, No. 01-cv-2244, this Court awarded $10 billion in compensatory and punitive damages against Sudan, which had defaulted, but which appeared after judgments were entered to file a motion to vacate them.  Those motions were denied, and the judgments affirmed.  *See Sheikh*, slip op. at 3-4.  That decision is currently before the D.C. Circuit.[6]

*Sheikh* was filed in 2014, and like the case at Bar was on behalf of the families of non-U.S. citizen victims killed in the course of their employment at the Embassies.  In *Sheikh*, Sudan appeared, and raised the limitations issue in its defense.  The Court concluded that the claims against Sudan were in fact barred, by statutory provisions in and related to the FSIA "terrorism exception." *Sheik*, slip op. at 13.

The *Sheikh* plaintiffs, however, also named Iran as a party defendant, claiming that it had financed the bombings, and Iran did not appear and did not plead limitations.  The question before the Court was, as it is here, whether it should dismiss claims against Iran *sua sponte*.  The Court did

---

[5] The request for diplomatic service was delivered to the Department of State on or about February 22, 2016.  By now presumably the package has been delivered to the Swiss Foreign Ministry in Bern for transmission to the Swiss Embassy (which houses the U.S. Interests Section) in Tehran.  Given, however, that if that assumption is correct the documents are no longer in American hands, it is difficult for anyone to predict when they will be delivered to their destination at the Iranian Foreign Ministry.
[6] *Owens, et al. v. Republic of Sudan, et al.*, No. 16-7049 (D.C. Cir.).

not resolve this question; instead, it permitted the *Sheikh* plaintiffs an opportunity to submit briefs arguing that their cases against Iran should not be dismissed as untimely.[7] It did, however, indicate both expressly and implicitly its intention to order dismissal of the claims against the Iranian regime unless the plaintiffs can come up with persuasive reasoning to allow them to continue.

   B. Under the Federal Rules, limitations is an affirmative defense
      that must be pleaded by a defendant; Iran has not done so here.

Although acknowledging that normally "a statute of limitations defense is waived if not timely raised by the defendant," *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 656 (4th Cir. 2006), and therefore that a case should not be dismissed on the Court's own motion when the defendant has not raised the relevant affirmative defense, this Court is proposing to do precisely that, relying on decisions of the Fourth and Ninth Circuits, as well as of District Courts in New York and California. *Sheikh*, slip op. at 13-15. The Court made no reference in its *Sheikh* opinion or its Order to Show Cause to a decision of this same Court in a case concerning the same Beirut Embassy bombings as are at issue in the case at Bar, in *Worley v. Iran*, 75 F.Supp.3d 311 (D.D.C. 2014).

The *Eriline* Court was quite clear in its conclusion that the cases in which it is appropriate for a trial court to raise affirmative defenses not pleaded by the defendant are exceptional and rare. And this is for good reasons, which go to the heart of our nation's adversary system of adjudication:

> As a defense waivable by the inaction of a party, the statute of limitations bears the hallmarks of our adversarial system of justice, a system in which the parties are obliged to present facts and legal arguments before a neutral and relatively passive decision-maker. *See United States v. Burke,* 504 U.S. 229, 246 (1992) (Scalia, J., concurring) ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one."). And because it "erod[es] the principle of party presentation so basic to our system of adjudication," the Supreme Court has cautioned that *sua sponte* consideration of a statute of limitations defense should be done sparingly by the trial courts,

---

[7] The *Sheikh* plaintiffs' briefs are due on the same day as the instant Memorandum.

>even in those narrow circumstances where it is authorized. *Arizona v. California,* 530 U.S. 392, 412–13 (2000).

*Eriline*, 440 F.3d 648, 654.  That Court concluded that *pro se* prisoner habeas corpus petitions (as well as petitions to file complaints *in forma pauperis*) qualify as exceptional, mainly out of concern for judicial economy:

>First, both habeas corpus and *in forma pauperis* proceedings, like failure to prosecute, abuse of process, and res judicata, implicate important judicial and public concerns not present in the circumstances of ordinary civil litigation. Second, in both habeas corpus and *in forma pauperis* proceedings, the district courts are charged with the unusual duty of independently screening initial filings, and dismissing those actions that plainly lack merit.

*Id.*, 440 F.3d 648, 656.  These considerations, however, do not apply to cases brought under the Foreign Sovereign Immunities Act against state sponsors of terrorism.  Indeed, if anything, the "important judicial and public concerns" presented by cases like this one militate in precisely the opposite direction, in favor of providing the victims of such terrorist acts with an opportunity to redress their injuries, and against allowing terrorist regimes to attack Americans with impunity.

Nor do the other cases cited by the Court in support of its position mandate the conclusion that the Court indicated it intends to reach.  *Taiwan Civil Rights Litig. Org. v. Kuomintang Bus. Mgmt. Comm.*, 486 F. App'x 671, 671–72 (9th Cir. 2012) (*per curiam*), is an unpublished opinion that cannot be cited as precedent even in the Ninth Circuit Court of Appeals that issued it.  *See* Ninth Circuit Rule 36-3(a) ("Unpublished dispositions and orders of this Court are not precedent," with exceptions not relevant here.).  Moreover, the entire reasoning of the *Taiwan per curiam* opinion turns on two cases: *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 686–87 (9th Cir. 1993) (in which the defendant had not waived the limitations defense), and *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986) (which stands for the uncontroversial proposition that District Courts addressing a motion for default judgment must evaluate the "sufficiency of the complaint").  *Taiwan Civil Rights Litig. Org.*, 486 F. App'x 671, 672. So that case is of no relevance, and no persuasive authority.

*De Santis v. City of New York*, 2014 WL 228659 (S.D.N.Y. Jan. 22, 2014) is an outlier decision, certainly not binding on this Court, which has been relied on precisely once for the proposition for which this Court cites it (in *Deswal v. U.S. Nat. Ass'n*, 2014 WL 4273336, at *1 (E.D.N.Y. Aug. 28, 2014)). Its broad-brush assertion of unlimited power for District Judges to dismiss cases regardless of the presence or absence of defendants ("The facts alleged in De Santis's Complaint firmly establish the statute of limitations defense. **Therefore**, under the standard set forth by the Second Circuit, this case presents the possibility of *sua sponte* dismissal on statute of limitations grounds."), *De Santis*, 2014 WL 228659, at *5 (emphasis added), is impossible to reconcile with such binding Supreme Court precedents as *U.S. v. Burke* and *Arizona v. California* (both cited by the Fourth Circuit in *Eriline*, *supra*).

Finally, in *Donell v. Keppers*, 835 F. Supp. 2d 871, 877 (S.D. Cal. 2011), because of a unique feature of California State law, the statute of limitations defense had not been waived by the defendant ("because this particular statute of limitations defense has not been and cannot be waived, the Court may consider it *sua sponte*"). That is a vital difference from the case at Bar, in which Defendants have not answered or pleaded to the complaint; obviously there will be no notice of default or motion for a default judgment until the time for such answer has passed, and the defense will have been waived. *John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 133 (2008).

It may well be that, in the Fourth Circuit, a trial court may on its own initiative raise and consider a *res judicata* defense that could have been (but was not) mounted by a defaulting sovereign defendant. *Clodfelter v. Republic of Sudan*, 720 F.3d 199, 209 (4th Cir. 2013) (*see Sheikh*, slip op. at 14-15). But such a conclusion does not support the notion that it is open to trial judges to raise on behalf of defaulting parties any and all affirmative defenses listed in Rule 8. This is true for at least the following reasons.

First, as the *Clodfelter* Court recognized, *res judicata* is a substantively different kind of affirmative defense from limitations. Indeed, the Court held, a trial court has discretion to raise *res judicata* on its own initiative, and the standard of review on appeal is whether that discretion was abused. But with respect to limitations, there is no discretion, and the standard of review is *de novo*:

> our case law recognizes *res judicata* as a special category of affirmative defense: one which implicates "important institutional interests of the courts" in addition to the interests of the litigants. *Eriline*, 440 F.3d at 654. As such, it is appropriate to distinguish the discretion vested in a district court's *sua sponte* consideration of *res judicata* from the *de novo* review we apply to a district court's *sua sponte* consideration of a statute of limitations affirmative defense. *Id.* at 653. We therefore review the district court's *sua sponte* decision to consider whether *res judicata* bars a plaintiff's claims for abuse of discretion.

*Clodfelter*, 720 F.3d 199, 208.

Second, the Fourth Circuit in *Clodfelter* was very mindful of its own earlier decision in *Eriline*, that, "as a general matter, a district court should not *sua sponte* consider an affirmative defense that the defendant has the burden of raising. *See Eriline,* 440 F.3d at 653–54. *Res judicata* is such a defense." *Clodfelter*, 720 F.3d 199, 208-09. Applying *Eriline* and *Arizona v. California*, the Court found very exceptional "special circumstances" to apply.[8] Those had to do – as this Court noted in *Sheikh*, slip op. at 14 – with "[c]omity in the face of an absent foreign sovereign," *Clodfelter*, 720 F.3d 199, 209 – but the relevance of comity in these circumstances was not self-explanatory. Certainly the Circuit did not say or suggest that the *sua sponte* invocation of a preclusive defense by the trial court in an FSIA case (which by definition involves a sovereign defendant that might claim entitlement to "comity") is *ipso facto* permissible.

But comity is a discretionary doctrine, having to do with the mutual respect that independent nations owe to one another. "Comity is not a rule of law, but one of practice, convenience, and

---

[8] Indeed, in *Clodfelter*, Judge Davis wrote separately to underscore this point: "*sua sponte* invocation of the *res judicata* affirmative defense is and should be the rare exception, not the rule, and one reserved for truly 'special circumstances.'" *Clodfelter*, 720 F.3d 199, 212 (Davis, J., concurring).

9

expediency." *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488 (1900). It reflects nothing more or less than "'a proper respect for [a sovereign's] functions,' " *Sprint Communications, Inc. v. Jacobs*, 571 U.S. ––––, 134 S.Ct. 584, 591 (2013), [which] fosters 'respectful, harmonious relations' between governments, *Wood v. Milyard*, 566 U.S. ––––, 132 S.Ct. 1826, 1832-1833 (2012)." *Michigan v. Bay Mills Indian Cmty.*, ___ U.S. ____, 143 S.Ct. 2024, 2041 (2014). In *Clodfelter*, considerations of comity may have been found applicable because, as the Fourth Circuit held in the facts of that case, Sudan had had "neither 'ample opportunity' nor 'cause' to raise a *res judicata* defense. *See Arizona*, 530 U.S. at 413." *Clodfelter*, 720 F.3d 199, 209. But here, by contrast, Iran has had many opportunities, in many different cases, to appear in this Court and to defend itself against the charge that it had financed and sponsored attacks on American diplomatic premises in Beirut. It has deliberately abstained from doing so. "As Chief Judge Lamberth observed with respect to Iran, it 'strains credulity' to suppose that a foreign state sponsor of terrorism 'has any reliance interests or settled expectations with respect to prior civil actions litigated against it under § 1605(a)(7),' particularly where – as here – that foreign sovereign has failed to appear in the terrorism action filed against it." *Clodfelter*, 720 F.3d 199, 211, citing *In re Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31, 85 (D.D.C. 2009).

It is hard to imagine any reason for extending comity, or any other discretionary benefit, in favor of Iran. Nor should the Court speculate on the possible repercussions for United States foreign policy of failing to do so. That might be a question to put to the Executive Branch by way of an invitation to submit a pleading in this case, but there is certainly no record before the Court that would justify concluding that setting aside the Order to Show Cause, and permitting the *Maalouf* case to proceed, would entail some kind of untoward international consequence.

Finally, the *Clodfelter* case involved unique and complicated facts not present here. The Fourth Circuit decision is obviously not binding on this Court as a matter of precedent, and to the

extent that it may be read as deviating from the settled rule regarding *sua sponte* invocations by courts of affirmative defenses not presented by absent defendants, it should not be followed. To read *Clodfelter* so expansively would be to present Iran with an after-the-fact grant of immunity – that is, impunity – for the murder of Americans and the local nationals who loyally served them in Beirut. With the greatest respect, Plaintiff urges this Court to take the approach of Judge Lamberth in *Worley*, and to "decline[] whatever discretionary authority it may have to raise the defense of limitations on Iran's behalf."

> C. The better approach is the one employed by Judge Lamberth in *Worley v. Iran*: nothing in the FSIA makes its limitations provision jurisdictional, <u>and the invitation to exercise judicial discretion in favor of Iran should be declined..</u>

In *Worley v. Islamic Republic of Iran*, Judge Lamberth carefully reviewed the very arguments made here, concluding that the limitations provision of § 1605A is not jurisdictional: "the Court concludes that compliance with section 1605A's statute of limitations is not required in order to assert subject matter jurisdiction. Therefore, the Court is not required to raise limitations on its own motion." *Id.*, 75 F. Supp.3d 311, 330. Reasoning that he was thus not required to dismiss a case initiated outside the limitation period, the question to which Judge Lamberth therefore turned his attention was whether to exercise judicial discretion to raise the limitation issue on his own motion. He concluded that he should not:

> In this case, however, the Court declines whatever discretionary authority it may have to raise the defense of limitations on Iran's behalf. It does so in light of the fundamental rule that statutes of limitations are generally treated as affirmative defenses that may be waived. *John R. Sand*, 552 U.S. at 133. Furthermore, before using its discretion to consider a defense not raised by a party, a court must "determine whether the interests of justice would be better served by addressing the merits or by dismissing the petition." *Day* [*v. McDonough*, 547 U.S. 198], 210 (internal citation and quotation marks omitted). **In this case, defendants have chosen not to appear in this litigation and they must take the consequences that attend that decision, including waiver of potentially legitimate defenses.** *See id.* at 210–11 (holding that dismissal *sua sponte* on the basis of limitations was appropriate where the record suggested it was

11

> mere "inadvertent error" that led the defendant to fail to raise the defense in its answer). While the Court recognizes that considerations of international comity are compelling, it will heed Congress's determination that the statute of limitations is not a requirement for exercise of subject matter jurisdiction and proceed to consideration of the merits.

*Id.*, 75 F. Supp.3d 311, 331 (emphasis added). Judge Lamberth cited and relied upon the same Supreme Court precedents on which this Court relied in *Sheikh*. The result is the conclusion that the Court is not obligated to dismiss this case as untimely, and even if it may have discretion to do so, it should not exercise that discretion here.

> D. There is no basis for extending judicial discretion in favor of a state sponsor of terrorism that is responsible for attacking an American Embassy.

There seems little reason to extend judicial discretion in favor of a state sponsor of terrorism that has been proved to have murdered Americans and others working at United States Embassies in the Middle East, and that has then demonstrated contumacy and even contempt in refusing to recognize this Court's authority. But Iran's abhorrent support for terrorism is not the only reason for declining to dismiss. The reasoning of *Worley* applies as well, including its reference to "the fundamental rule that statutes of limitations are generally treated as affirmative defenses that may be waived. *John R. Sand*, 552 U.S. at 133." 75 F. Supp.3d 311, 331.

As Judge Lamberth held, ultimately, before using its discretion to consider a limitations defense not raised by a party, a court must "determine whether the interests of justice would be better served by addressing the merits or by dismissing the petition as time-barred," citing *Day,* 547 U.S. 198, 210. Here, Plaintiff respectfully submits that the interests of justice weigh heavily in his favor. He is an innocent victim of terrorism; Defendants are the sponsors and financiers of that terrorism. He is a voluntary and respectful petitioner before this Court; Defendants have had numerous opportunities to explain their position to Judges in this District, and they have ignored

every one.  He will lose any hope of relief if this case is dismissed; a victory for Defendants will serve merely to lower the cost of their sponsorship of anti-American terrorism.

Moreover, the general rule remains that an affirmative defense that is not raised is forfeited. Certainly the Court of Appeals for the District of Columbia Circuit has so held, for example in *Smith-Haynie v. D.C.*, 155 F.3d 575 (D.C. Cir. 1998): since "'[f]ailure to raise an affirmative defense in pleadings deprives the opposing party of precisely the notice that would enable it to dispute the crucial issues of the case on equal terms,' [*Harris v. Secretary, U.S. Dep't of Veterans Affairs,* 126 F.3d 339, 343 (D.C. Cir. 1997),] a defendant forfeits an affirmative defense that is not pleaded in its answer or amended answer." *Smith-Haynie*, 155 F.3d 575, 577.  The fact that they have made the affirmative choice not to participate in these cases provides further reason for a court to decline to exercise discretion to rescue recalcitrant Defendants from the consequences of their own decisions. Here, as in *Worley*, "Defendants have chosen not to appear in this litigation and they must take the consequences that attend that decision, including waiver of potentially legitimate defenses." *Id.* at 331.

Judge Bates cited *Worley* – at least with respect to its jurisdictional determination – with approval in *Owens*, the case on the basis of which the *Sheikh* plaintiffs brought their action, citing in addition the very recent decision of the Supreme Court in *Musacchio v. United States*, ___ U.S. ___, 136 S.Ct. 1625, 1632 (2016) that "courts should treat a time bar as jurisdictional only if Congress has clearly stated that it is."  The rest of the reasoning of *Worley*, however, is equally applicable here. Plaintiff Maalouf respectfully submits that the "interests of justice would be better served by addressing the merits [than] by dismissing the petition," applying the test that the Supreme Court laid down in *Day*, 547 U.S. 198, 210.

E. <u>There is a compelling case for equitable tolling on the facts presented here.</u>

As is attested in the attached Declaration of Henri Maalouf, Plaintiff in this action, this matter presents a strong case for equitable tolling of any otherwise applicable limitations period. At the default judgment stage, when the FSIA requires that a claimant "establish[] his claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), Plaintiff Maalouf will be prepared to testify under oath: (a) that he was not aware until the end of 2015 that there was any prospect of litigation anywhere in the world against Iran relating to the murder of his brother; (b) that for years he was living outside of Lebanon and was not in regular contact with family members who had participated in the *Doe* case; (c) that inquiries to the U.S. Embassy Beirut did not disclose that there was civil litigation pending in the United States; (d) that he was never contacted by anyone attempting to assemble a class of relatives of Embassy bombing victims; and (e) that once he became aware of the possibility of filing a civil action (because of media reports concerning what was to become 42 U.S.C. § 10609, he promptly contacted Crowell & Moring, LLP, the Washington law firm that represented the plaintiff class in *Doe*, which referred him to undersigned counsel. The process of retaining attorneys to represent him, negotiating the terms of the engagement, and having counsel research and draft a complaint for filing in this Court took a few months. Plaintiff Maalouf respectfully submits that he acted diligently and with dispatch, and that he should not be punished for failing to act when he had no reason to know that action was in any way feasible.

The idea that a lawsuit might be filed (1) in the United States, (2) against the Iranian regime on the basis of proof of its involvement in the Beirut attacks, and (3) for money damages, would hardly be intuitive to a resident of Lebanon, brought up in a very different legal system and unfamiliar with such notions as sovereign immunity.

### III. Congress Contemplated that New Cases Would Be Brought Based on Past Terrorist Attacks.

A. Congressional intent is relevant to this inquiry.

As this Court is well aware, Congress has not been silent on the question of compensating victims and the families of victims of state sponsors of terrorism like the Iranian regime. Its amendment to the FSIA, repealing the former 28 U.S.C. § 1605(a)(7) and replacing it with 28 U.S.C. § 1605A, was intended to facilitate the bringing of civil suits against such defendants, *inter alia* b expanding the class of potential plaintiffs. See Sheikh, slip op. at 4.

More recently, Congress passed legislation, signed into law by President Obama in December 2015, to create a "Victims' Compensation Fund" ("VCF") from which victims and families may receive partial payments of judgments against Iran and other international criminal regimes that would otherwise be uncollectible. Justice for United States Victims of State Sponsored Terrorism Act, Pub. Law 114-113, 42 U.S.C. § 10609. This has obviously created a motivation for potential plaintiffs to come forward, no longer needing to feel that the only reward for reliving the worst times of their lives would be some kind of psychic vindication.

Nor is there anything venal or unprincipled about this. While there have been many instances of individuals pursuing claims against human rights abusers under the Alien Tort Statute and the Torture Victims Protection Act, 28 U.S.C. § 1350 and § 1350note, even though they had absolutely no prospect of ever receiving monetary compensation, it does not follow that the failure to engage in what may seem a purely symbolic gesture should bar a victim from asserting his or her rights once doing so would have more practical consequences.

B. The enactment of the Victims' Compensation Fund demonstrates Congressional intent that such cases as this be heard.

The right to participate in distribution of the contents of the VCF is not limited to individuals with judgments already in place as of the date of enactment of the Act. Congress

contemplated that there would be other victims and family members coming forward, who also satisfy the statutory criteria of eligibility. *See*, for example, § 10609(c)(3)(A)(ii), permitting an applicant to submit his or her claim "not later than 90 days after the date of obtaining a final judgment, with regard to a final judgment obtained on or after" the date of publication of the official announcement that the VCF is open for business, which is expected to take place before the middle of 2016. Moreover, the VCF will not sunset until January 2026 (*see* § 10609(e)(6)(A)), demonstrating further Congress's understanding that there will be other plaintiffs pursuing judgments against state sponsors of terrorism. There is no limitation in the Act excluding individuals whose situations are like Plaintiff Maalouf's. And news reports make clear that there were many more victims of the 1983 and 1984 Beirut Embassy bombings than there were plaintiffs in the Doe case and other litigation deriving from those attacks.

Congress could have made the timeliness provision jurisdictional when it adopted what is now 28 U.S.C. § 1605A; but it did not. Congress could have limited eligibility for the Victims Compensation Fund to those with judgments already in place as of the date of its enactment (with or without including potential plaintiffs whose cases were already before the courts); but it did not. It is fair to infer that Congress contemplated and did not discourage applications to participate in the VCF from people like Henri Maalouf: people who were victims, or whose family members were victims, of terrorist attacks on United States diplomatic premises organized or financed by rogue regimes. And it is reasonable to anticipate that there will be other plaintiffs – including Foreign Service Officers, military personnel including Marine guards, and relatives of Lebanese nationals killed or injured whose demands for justice and accountability should be heard by this Court.

## IV.    Conclusion.

For all of these reasons, Plaintiff Henri Maalouf respectfully submits that this case should not be dismissed as untimely, and that he should be given an opportunity to present it for

adjudication on the merits after Iran makes clear its intention to default, and Plaintiff moves for a default judgment pursuant to 28 U.S.C.

Respectfully submitted,

/s/
_____
Steven M. Schneebaum
D.C. Bar No, 956250
Cynthia L. McCann
STEVEN M. SCHNEEBAUM, P.C.
1776 K Street, N.W.; Suite 800
Washington, D.C. 20006
Tel.: (202) 742-5900
Email: sms@smslawdc.com

Of counsel:   Allan Gerson
              AG-INTERNATIONAL LAW PLLC
              2131 S Street, N.W.
              Washington, D.C. 20008

Dated: April 25, 2016.